**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 98-4889

ADAN FLOREZ HERNANDEZ, a/k/a
Canela, a/k/a Flores Adam
Hernandez, a/k/a Jose Garcia,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 98-4891

ELIGIO NARIO SOTO, a/k/a Juan
Camane,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                          No. 98-4899

REMEDIOS NARIO SOTO,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CR-97-291)

Argued: December 3, 1999

Decided: January 10, 2000

Before NIEMEYER and WILLIAMS, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Lawrence Jay Fine, Winston-Salem, North Carolina, for
Appellant Remedios Soto; Bryan Emery Gates, Jr., Winston-Salem,
North Carolina, for Appellant Hernandez; Thomas Norman Cochran,
Assistant Federal Public Defender, Greensboro, North Carolina, for
Appellant Eligio Soto. Sandra Jane Hairston, Assistant United States
Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:**
Walter C. Holton, Jr., United States Attorney, Greensboro, North Car-
olina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellants Eligio Nario Soto (Eligio), Remedios Nario Soto
(Remedios), and Adan Flores Hernandez (Hernandez) were convicted
of conspiracy to possess with intent to distribute cocaine hydrochlo-
ride, in violation of 21 U.S.C.A. § 846 (West 1999). Eligio and Reme-
dios each received a sentence of 204 months imprisonment, five years
supervised release, and a $100 special assessment. Hernandez
received a sentence of 155 months imprisonment, five years super-
vised release, and a $100 special assessment. Appellants now appeal,
claiming that several errors were committed at their trial and sentenc-

2

ing proceedings. We reject each of Appellants' arguments and affirm their convictions and sentences.

I.

On December 4, 1997, Eligio, his brother Remedios, and Hernandez were arrested based upon a warrant and complaint. In conjunction with the arrests, law enforcement officers conducted a valid search of Remedios's Asheboro, North Carolina residence and discovered two firearms, an unloaded assault rifle and an unloaded hunting rifle, in a closet of the master bedroom. Also in the closet were $5000 in cash and a bag containing two rifle magazines and twenty-eight rounds of ammunition for the assault rifle. Police officers also found an additional $5520 in cash and approximately twenty-five grams of cocaine in the master bedroom. A search of Eligio's Asheboro residence uncovered, among other things, $5930 in cash in items of Eligio's clothing, approximately twenty-eight grams of cocaine in a bedroom, and photographs of Hernandez posing with various firearms, including assault weapons. The police found the photographs in the bedroom of Hernandez, who stayed at Eligio's residence.

On December 15, 1997, Appellants were named in a twelve-person indictment charging all indicted with conspiracy to possess with intent to distribute cocaine hydrochloride, in violation of 21 U.S.C.A. § 846 (West 1999).[1] Appellants' trial in the United States District Court for the Middle District of North Carolina began on May 18, 1998. Evidence presented at trial indicated that Eligio, Remedios, and Hernandez were intimately involved in an extensive drug operation in Asheboro that had its roots in Mexico. Mike Bittle (Mike), an original codefendant who agreed to testify on the Government's behalf in exchange for the dismissal of charges against him, and his cousin Mark Bittle (Mark), who agreed to testify in exchange for the Government's promise not to charge him in the case, testified that they had purchased large quantities of illegal drugs from Appellants. Mike also

---

[1] Of the nine other people named in the indictment, two remain fugitives, two were dismissed by the Government, one agreed to become a Government witness in exchange for a dismissal of the charge against him, three entered pleas of guilty, and one was convicted in a separate trial.

testified that Eligio had approached him seeking a handgun but then declined to purchase it when Mike acquired one for him. Mark testified that each of the Appellants had delivered cocaine to him on occasion. The Bittles also identified Eligio's and Remedios's voices on lawfully intercepted phone conversations that implicated the brothers in the conspiracy. A translator responsible for monitoring wiretaps for the Drug Enforcement Administration who was familiar with Hernandez's voice offered testimony specifically identifying Hernandez's voice on other taped phone calls conducted in Spanish that implicated Hernandez in the drug ring. The district court allowed the Government to introduce three of the photographs seized from Hernandez's room that depicted Hernandez posing with assault weapons.

Remedios testified in his own defense and denied participation in the conspiracy. Remedios was allowed to present testimony concerning a conversation he had with Eligio while the two were in custody awaiting trial. According to Remedios's testimony, before his arrest he had no knowledge of the cocaine and money found in his bedroom. He purportedly learned from Eligio, while the two were in custody, that Eligio had stored the drugs and money in Remedios's bedroom. Remedios testified that he "scolded" Eligio upon learning of this information:

> Q. What if anything did you say to him, first off, about the drugs and the money?
>
> [Remedios]. I - I scolded him. I said, what are you doing, why have you been doing that, because I've got a family at home.

(J.A. at 303.)

Following Remedios's initial testimony, the district court expressed its concern that some of Remedios's testimony regarding this conversation might contain inadmissible hearsay. The district court permitted Remedios's defense counsel to examine Remedios outside the presence of the jury to see what potential evidentiary problems his testimony might have. During this examination, Remedios testified as follows:

4

Q. Did [Eligio] tell you how -- did your brother tell you how the drugs got into your bedroom?

[Remedios]. Because he put them there.

Q. Did he tell you when he put them there?

[Remedios]. No.

Q. What did you say to him after he told you that?

[Remedios]. I got mad. I yelled at him. I said, why are you going around doing that sort of thing. I've got a family at home and I --

. . . .

Q. What, if anything, Mr. Soto, did you request of your brother to do after you learned of this information?

[Remedios]. I asked him to talk to his lawyer to straighten it out so that they wouldn't blame me and to let me go home because I wasn't involved.

(J.A. at 306-08.)

After hearing this testimony outside the presence of the jury, the district court ruled that it would allow Remedios to testify that he did not put the drugs and money in his bedroom, that Eligio told Remedios that Eligio put the items in Remedios's bedroom, and that Remedios "was angry at [Eligio]." (J.A. at 322.) The district court ruled that it would not allow Remedios to testify about what he told Eligio during the conversation.

When the trial resumed, Remedios testified in part as follows:

Q. And did you ask [Eligio] if he knew anything about the money and the drugs that were found in your home?

[Remedios]. Yes.

5

. . . .

Q. What did he say to you in response to that question?

[Remedios]. That he had put them there.

Q. Did you know he was going to do that?

[Remedios]. No.

Q. Did you give him permission to do that?

[Remedios]. No.

Q. I'm sorry, I don't know -- I don't recall if I asked you this yesterday. When was the first time you learned that the cocaine and $10,000 was found in your home?

[Remedios]. When they brought me here to Greensboro.

Q. Was that after you were arrested?

[Remedios]. Yes. Yes, when they arrested me, they brought me here and they told me.

Q. Let me ask you, did you participate in the drug conspiracy as it is charged in the indictment and as the evidence -- as has been tried here this week?

[Remedios]. No.

(J.A. at 329-30.)

At the completion of the trial, the jury found Remedios, Eligio, and Hernandez guilty of conspiracy to possess with intent to distribute cocaine, as charged in the indictment.

At the December 3, 1998, sentencing proceedings, the district court enhanced Remedios's and Eligio's sentences by two levels, pursuant

6

to <u>U.S. Sentencing Guidelines Manual</u> § 2D1.1(b)(1) (1998), for possessing a firearm in connection with the drug conspiracy. The district court based this increase upon the presence of the two rifles found in Remedios's bedroom closet. The court stated at Remedios's sentencing that "the assault rifle was in the closet of[Remedios's] bedroom which contained over $10,000 in cash and contained cocaine, there were 28 rounds of ammunition and two magazines next to the assault rifle, and I think that clearly warrants the enhancement." (J.A. at 415.) The court also found that the presence of these firearms was foreseeable to Eligio.

The court also enhanced Remedios's sentence an additional two levels, pursuant to U.S.S.G. § 3C1.1, for giving perjurious testimony. The district court found Remedios's trial testimony"inherently incredible," (J.A. at 412), and adopted the factual findings contained in the presentence report, which set forth in greater detail the reasons for enhancing Remedios's sentence under § 3C1.1.

In this appeal, Remedios first argues that the district court improperly prevented him from presenting testimony concerning what he told Eligio after learning that Eligio had placed drugs and money in Remedios's bedroom. Next, Hernandez argues that the district court abused its discretion by admitting photographs of him posing with various firearms. Appellants also assert that the admission of testimony from the Bittles violated 18 U.S.C.A. § 201(c)(2) (West Supp. 1999). Remedios and Eligio argue that their two-level sentence enhancements pursuant to U.S.S.G. § 2D1.1(b)(1) were in error. Eligio and Remedios further contend that § 2D1.1(b)(1) impermissibly shifts the burden to defendants to prove that the presence of a firearm was unconnected to the underlying drug conspiracy. Finally, Remedios argues that he should not have received a sentence enhancement pursuant to U.S.S.G. § 3C1.1. We now address Appellants' arguments in turn.

II.

Remedios argues that the district court erred in refusing to admit his testimony concerning statements he made to Eligio after Remedios purportedly first learned about the narcotics and large sums of money found in his home. Remedios contends that the district court

7

should have admitted his statements under either the excited utterance hearsay exception, Fed. R. Evid. 803(2),**2** or the "then existing state of mind" hearsay exception, Fed. R. Evid. 803(3). **3** We review the district court's evidentiary ruling for an abuse of discretion, subject to harmless error analysis. See United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997).

The district court refused to allow Remedios to testify concerning a specific statement he made to Eligio that, Remedios argues, demonstrates his lack of involvement in the crime.**4** The court permitted Remedios to present other testimony, however, that was substantially similar to the testimony that was excluded. Through this other testimony, Remedios was permitted to explain that he was generally unaware that there were drugs and large sums of money in his bedroom until after he was arrested; that Eligio had put the drugs and money in Remedios's bedroom without Remedios's knowledge or permission; that Remedios scolded Eligio when he learned that Eligio had hidden these items in Remedios's bedroom; and that Remedios was not involved in the drug conspiracy.

---

**2** Federal Rule of Evidence 803(2) provides that the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

**3** Federal Rule of Evidence 803(3) provides that the hearsay rule does not exclude

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

**4** The testimony in question, which Remedios proffered in an examination outside the presence of the jury, is as follows:

> Q. What, if anything, Mr. Soto did you request of your brother to do after you learned of this information?
>
> [Remedios]. I asked him to talk to his lawyer to straighten it out so that they wouldn't blame me and to let me go home because I wasn't involved.

(J.A. at 308.)

8

Even assuming, without deciding, that Remedios's proffered testimony fell within an exception to the hearsay rule, 5 and that the district court improperly prevented Remedios from testifying that he asked Eligio to talk to Eligio's lawyer to help Remedios get out of trouble, any error was certainly harmless. The district court permitted Remedios to testify to virtually all aspects of his conversation with Eligio. The testimony that Remedios was allowed to present amply informed the jury of his version of the story. The excluded testimony was sufficiently cumulative of this other admitted testimony for us to conclude that any possible error in its exclusion was harmless and did not "substantially sway[ ]" the judgment.**6** See Kotteakos v. United States, 328 U.S. 750, 765 (1946).

III.

Hernandez argues that the admission of photographs portraying him posing with various assault weapons was an abuse of discretion because the district court should have excluded the evidence under Federal Rule of Evidence 403. Rule 403 instructs that district courts may exclude otherwise relevant evidence if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. We will not overturn a district court's Rule 403 judgment "except under the most extraordinary of circumstances, where [a trial court's] discretion has been plainly

_____

**5** We note that Remedios's reliance on the excited utterance exception seems particularly misplaced. At the time of Remedios's conversation with Eligio concerning the drugs and money found in Remedios's bedroom, Remedios was already in custody for the drug conspiracy. We are skeptical of Remedios's contention that his learning that Eligio placed the items in Remedios's bedroom was a sufficiently "startling event" to trigger invocation of the excited utterance exception. See Fed. R. Evid. 803(2). In addition, we think it strains the senses to conclude that Remedios's reaction to Eligio was made under the "stress of excitement" of this "startling event." See id.

**6** We also reject Remedios's argument that the exclusion of this testimony prevented him from presenting a complete defense in violation of the Sixth Amendment to the Constitution.

9

abused." United States v. Love, 134 F.3d 595, 603 (4th Cir.) (internal quotation marks omitted), cert. denied, 118 S. Ct. 2332 (1998). Moreover, we will "examine the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." Id. (internal quotation marks omitted).

We, and other courts, have long recognized that firearms are "tools of the drug trade." United States v. Ward, 171 F.3d 188, 195 (4th Cir.), cert. denied, 120 S. Ct. 137 (1999); see also United States v. White, 875 F.2d 427, 433 (4th Cir. 1989); United States v. Terzado-Madruga, 897 F.2d 1099, 1120 (11th Cir. 1990) ("It is uniformly recognized that weapons are often as much `tools of the trade' as the most commonly recognized narcotics paraphernalia."). As such, firearms evidence is often relevant in cases involving illegal narcotics operations. See Ward, 171 F.3d at 195.

Hernandez's involvement in the drug conspiracy was well supported by the evidence as was the use of firearms. His voice was identified in phone conversations discussing aspects of the conspiracy and Mark testified that Hernandez had delivered cocaine to him. Mike testified that Eligio had asked Mike to buy a firearm for Eligio although Eligio eventually declined to purchase the firearm that Mike acquired. Firearms were also found during a search of Remedios's residence. This evidence suggests that firearms may have been employed in the course of the conspiracy. The photographs of Hernandez posing with assault weapons was consistent with this other evidence and provided further support for the conclusion that Hernandez was an illegal participant in the drug ring. Moreover, in light of this other evidence, we conclude that any potential prejudice stemming from the introduction of this evidence would not have outweighed its probative value.

Viewing the evidence in the light most favorable to the Government and maximizing its probative value while minimizing its prejudical effect, as we must, we hold that the district court did not abuse its discretion in allowing the Government to introduce the three photographs of Hernandez posing with firearms.

IV.

Appellants contend that the district court improperly admitted testimony from the Bittles because they provided testimony in exchange for the Government's agreement not to prosecute them, purportedly in violation of 18 U.S.C.A. § 201(c)(2) (West Supp. 1999).[7] We have recently held that § 201(c)(2) does not prevent the United States from "acting in accordance with its statutory authority to use immunity, leniency, and plea agreements to obtain truthful testimony." United States v. Richardson, No. 98-4139, 1999 WL 686892, *4 (4th Cir. Sept. 3, 1999). Our holding in Richardson forecloses Appellants' § 201(c)(2) argument, and we thus hold that the testimony of the Bittles was properly admitted.

V.

Eligio and Remedios next challenge the offense level enhancements in their sentences for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). The district court imposed a two-level adjustment because two firearms -- an unloaded assault weapon and an unloaded hunting rifle -- were found in a closet in Remedios's bedroom during a search. The closet also contained $5000 in cash and a bag containing ammunition for the assault rifle. An additional $5520 in cash and twenty-five grams of cocaine were found outside the closet in the bedroom. Remedios argues that the enhancement was improper because the firearms were not connected to the drug conspiracy. Eligio argues, in addition, that he should not be held responsible for

---

[7] Section 201(c)(2) provides that

> Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C.A. § 201(c)(2).

11

firearms that were found in Remedios's residence. Finally, Remedios and Eligio both argue that Application Note 3 to § 2D1.1(b)(1) unconstitutionally requires them to prove that the firearms were unconnected to the underlying conspiracy.

Section 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." U.S.S.G. § 2D1.1(b)(1). Application Note 3 to that section explains that

> [t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2D1.1, comment. (n. 3). In construing § 2D1.1(b)(1), we follow "the Application Notes as authoritative unless they are inconsistent with the Constitution, a federal statute, or a plain reading of the Guidelines." United States v. Harris, 128 F.3d 850, 852 (4th Cir. 1997) (citing Stinson v. United States, 508 U.S. 36, 45 (1993)).

We review the district court's factual findings related to its enhancement determination for clear error. See id. at 852. We review the district court's legal interpretation of the sentencing guidelines and Appellants' constitutional challenge to the Sentencing Guidelines de novo. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989).

A.

Remedios argues that the district court erred in finding that the presence of unloaded rifles in his bedroom closet warranted an increase in his base offense level under § 2D1.1(b)(1). In following the instructions set forth in Application Note 3, the district court expressly found that it was not clearly improbable that the firearms were connected to the drug conspiracy.[8]  The mere fact that one of the

_____

[8] The court noted that it "[c]ertainly [could not] find from [the evidence] that there was an improbable connection between the drug business and the possession of the firearm." (J.A. at 385.)

12

firearms found in the bedroom closet was an unloaded hunting rifle, the very example excepted from a § 2D1.1(b)(1) sentence enhancement in Application Note 3, does not undermine the district court's determination because here, there was also an assault weapon present. Moreover, the district court stressed the close proximity that the guns had to more than $10,000 in cash, twenty-five grams of cocaine, and a considerable amount of ammunition found in the same closet. In United States v. Harris, 128 F.3d 850 (4th Cir. 1997), we "unequivocally affirm[ed] the rule, already recognized in several other circuits, that the proximity of guns to illicit narcotics can support a district court's enhancement of a defendant's sentence under Section 2D1.1(b)(1)." Id. at 852. In that particular case, we held the enhancement proper when an unloaded firearm was found in the same dresser as cocaine. See id. at 853. Likewise, we have also held that an enhancement is appropriate when a firearm is found in one room and cocaine is found in another. See United States v. Nelson, 6 F.3d 1049, 1054-1057 (4th Cir. 1993).

In this case, given the close proximity the firearms had to the drugs and money, the district court's determination that the presence of the two firearms in Remedios's closet warranted a two-level sentence enhancement was sound and not clearly erroneous.

B.

Eligio also argues that his sentence enhancement under U.S.S.G. § 2D1.1(b)(1) was improper. As discussed above, the district court did not err in concluding that the firearms found in Remedios's bedroom closet were sufficiently connected to the narcotics conspiracy to warrant an enhancement. The question we now consider is whether Eligio should bear responsibility for the firearms found in his brother's home.

In United States v. Kimberlin, 18 F.3d 1156 (4th Cir. 1994), we ruled that a sentence enhancement under § 2D1.1(b)(1) was appropriate for a defendant who reasonably could foresee that a coparticipant would possess a weapon. See id. at 1160. As we explained, "`[a]bsent evidence of exceptional circumstances . . . it [is] fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal

13

venture includes an exchange of controlled substances for a large amount of cash.'" Id. (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991) (alterations in original).

We believe there was ample evidence in this case to support the inference that Eligio reasonably could have foreseen Remedios's possession of a firearm. The brothers were engaged in substantial illegal drug activity, involving thousands of dollars, and both money and cocaine were kept in Remedios's house. As the district court ruled at Eligio's sentencing proceeding, "[b]ecause of the connection of [Remedios's] residence with the drug business of Eligio and Remedios, it certainly is foreseeable that the firearms would be there to protect the money as well as drugs, and I find that Eligio should be accountable for the presence of the firearms." (J.A. at 385.) We hold that the district court's determination to enhance Eligio's sentence by two levels, pursuant to U.S.S.G. § 2D1.1(b)(1), was not clearly erroneous.

C.

We now turn to Eligio and Remedios's next argument that the language used in Application Note 3, instructing that the enhancement should apply "unless it is clearly improbable that the weapon was connected with the offense," impermissibly shifts the burden of proof to them to demonstrate that any weapon present was not connected to the offense. According to Eligio and Remedios's argument, this burden-shifting scheme violates the due process requirement that the Government must prove sentence enhancements by at least a preponderance of the evidence.

We have stated that the Government must prove factors that warrant a sentencing enhancement by a preponderance of the evidence. See United States v. Urrego-Linares, 879 F.2d 1234, 1239 (4th Cir. 1989). The Supreme Court has expressly held that a preponderance of the evidence standard for sentencing factors satisfies the requirements of due process. See McMillan v. Pennsylvania, 477 U.S. 79, 91-93 (1986). Remedios and Eligio contend that McMillan established a due process floor concerning constitutionally permissible burdens of proof to follow at sentencing. Because, in Eligio and Remedios's view, Application Note 3 shifts to them the burden of

14

proving that the firearms were unconnected with the drug conspiracy and thus falls below the floor established in McMillan, they suggest that we ignore the application note as commentary violative of the Constitution. See United States v. Harris, 128 F.3d 850, 852 (4th Cir. 1997) (citing Stinson v. United States, 508 U.S. 36, 45 (1993)).

We first note that no federal Court of Appeals has adopted Eligio and Remedios's view that Application Note 3 violates the Due Process Clause of the Fifth Amendment. Indeed, at least two circuits have explicitly rejected this argument. See United States v. Restrepo, 884 F.2d 1294, 1296 (9th Cir. 1989) (holding that the "clearly improbable" language contained in Application Note 3 simply acts as an "exception" to an enhancement imposed after the Government proves that a firearm was possessed); United States v. McGhee, 882 F.2d 1095, 1099 (6th Cir. 1989) (holding that § 2D1.1(b)(1) does not violate due process, partly because it is more favorable to the defendant than the enhancement at issue in McMillan because the defendant has the opportunity to show that it is clearly improbable that the firearm is connected to the drug offense -- "an opportunity the defendant in McMillan did not have"). In addition, the Eighth Circuit has indicated that there is no Due Process Clause violation because "[t]he `unless clearly improbable' language does not shift the burden of proof to the defendant; the government must prove by a preponderance of the evidence that the weapon is connected to the offense." United States v. Payne, 81 F.3d 759, 764 (8th Cir. 1996). According to Payne, the Government must "prove by a preponderance of the evidence both that `the weapon was present and that it is at least probable that the weapon was connected with the offense.'" Id. at 762 (quoting United States v. Hayes, 15 F.2d 125, 127 (8th Cir. 1994). Considering these rulings from our sister circuits, we have serious doubts about the viability of Eligio and Remedios's due process argument. Indeed, they cite no case in support of their position.

Moreover, in this case, the burden never shifted to Eligio and Remedios because the district court found, based entirely upon the evidence presented by the Government at sentencing, that not only were the firearms present, but that it was not clearly improbable that the firearms were connected to the conspiracy. The court stressed that large amounts of money, ammunition, and cocaine were found together with the assault weapons, either in the same closet or just

outside in the adjoining bedroom. In light of this substantial evidence, the Government easily met its burden of proving by a preponderance of the evidence that the firearms were not clearly improbably connected to the drug conspiracy. Because this clear evidence indicated the firearms' connection to the conspiracy, the burden never shifted to Eligio and Remedios. Given this course of events at sentencing, it is unnecessary for us to reach the due process question based upon Eligio and Remedios's burden-shifting theory.

VI.

Finally, Remedios argues that the district court improperly enhanced his offense level by two levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. The district court based this adjustment upon its finding that Remedios committed perjury while testifying.[9]

In United States v. Dunnigan, 507 U.S. 87 (1993), the Supreme Court held that for a district court to increase a defendant's sentence for perjury under § 3C1.1, the court must establish that a defendant provided (1) "false testimony," (2) "concerning a material matter," (3) "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. at 94. The Court further noted that district courts must either make a clear finding on each separate perjury element or make one global finding that encompasses all of the necessary factual predicates for a finding that perjury was committed. See id. at 95.

We review the district court's factual findings that serve as a basis for an obstruction-of-justice enhancement for clear error and we review de novo whether the district court properly stated its factual findings as required by Dunnigan. See United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989).

_____

[9] Section 3C1.1 provides that a sentencing court may impose a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The United States Supreme Court has held that an adjustment under this section is appropriate if the sentencing court determines that a defendant committed perjury in the course of the proceedings. See United States v. Dunnigan, 507 U.S. 87, 92-98 (1993).

16

We have strictly enforced the requirements of <u>Dunnigan</u> and will not hesitate to remand a sentencing decision that failed adequately to state the basis for a perjury finding. <u>See</u>, <u>e.g.</u>, <u>United States v. Stotts</u>, 113 F.3d 493, 498 (4th Cir. 1997) (finding a § 3C1.1 adjustment improper when the district court found that the defendant falsely testified at trial, but failed to "specify the testimony in question, . . . whether the testimony related to a material matter, and . . . whether [the defendant] willfully intended to give false testimony or whether the false testimony resulted from confusion or mistake"); <u>United States v. Smith</u>, 62 F.3d 641, 647 (4th Cir. 1995) (remanding for resentencing after finding a § 3C1.1 enhancement improper because the district court failed to make adequate findings that the elements of perjury were met).

After hearing Remedios's objection to a sentence enhancement for perjury, the district court indicated that it thought his testimony was "inherently incredible." (J.A. at 412.) The district court also adopted the factual findings and guideline applications of the presentence report. The presentence report recommended a two-level adjustment in Remedios's base offense level based upon § 3C1.1. Paragraph 21 of the presentence report provides:

> <u>Adjustment for Obstruction of Justice:</u> [Remedios] elected to testify in his own behalf at trial. During the course of his testimony, [Remedios] denied he had ever delivered drugs to Mark Bittle or received any money from him. [Remedios] testified he had no knowledge of the cocaine and money found in his bedroom and further stated that his brother Eligio told him he (Eligio) had placed the cocaine and money in his house. [Remedios] then testified that he told Eligio to talk to his lawyer "to straighten it out so that they wouldn't blame me and to let me go home because I wasn't involved." In light of the evidence presented by the government, the probation officer is of the opinion [Remedios] provided false testimony that was not the result of confusion, mistake or faulty memory. [Remedios], therefore, has obstructed the administration of justice. Pursuant to [U.S.S.G.] § 3C1.1, two levels are added.

(J.A. at 486.)

17

We hold that the district court's adoption of these findings provided an adequate basis to impose a two-level enhancement under § 3C1.1. Paragraph 21 of the presentence report sets forth facts sufficient to find each of the three essential elements of perjury, as announced in <u>Dunnigan</u>: (1) that Remedios provided "false testimony," (2) "concerning a material matter," (3) "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." <u>Dunnigan</u>, 507 U.S. at 94. The presentence report specifically finds that Remedios provided "false testimony" and that he did so not as a "result of confusion, mistake, or faulty memory." Although the presentence report did not specifically find "materiality," it is clear that the false statements made by Remedios concerned matters central to his case, e.g., whether he delivered drugs to Mark and whether he knew there was money and cocaine in his bedroom. <u>See United States v. Haas</u>, 171 F.3d 259, 268 (5th Cir. 1999) (upholding a district court's § 3C1.1 enhancement after concluding that the court's adoption of the factual findings set forth in the presentence report provided the necessary factual predicates upon which to satisfy <u>Dunnigan</u>, and finding the materiality element as a matter of law when the presentence report failed to specifically find "materiality"). We thus conclude that the district court's adoption of the factual findings of the presentence report adequately met <u>Dunnigan</u>'s strict requirements. Furthermore, we find that the factual findings contained in the presentence report that provided the basis for the perjury finding were amply supported by the record and were not clearly erroneous.

VII.

For the reasons stated herein, we reject Appellants' arguments concerning their convictions and sentences and affirm the judgment of the district court.

<u>AFFIRMED</u>

18